## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

LUKE MYERS, on behalf of himself and
those similarly situated,

      Plaintiff,

v.                                        Case No. 2:23-cv-01096-DHU-JHR

PAPA TEXAS, LLC; GUILLERMO PERALES;
DOE CORPORATION 1-10; and John Doe 1-10;

      Defendants.

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Papa Texas, LLC.'s  Motion to Dismiss and Enforce Settlement Agreement, filed on January 18, 2024 ("Motion").  Doc. 11.  On February 01, 2024, Plaintiff responded to the Motion, and Defendant replied on February 20, 2024.  Doc. 17, 23.  The Court held a hearing on the Motion on May 02, 2024, at which counsel for all parties were present.  Having considered the briefs on this issue, the record, the arguments of counsel, and the applicable law, the Court will **GRANT IN PART, AND DENY IN PART** the Motion.

### I.
### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Luke Myers ("Plaintiff") is a pizza delivery driver.  Doc. 11. Defendant Papa Texas, LLC., ("Defendant") employed Plaintiff to work at its Papa John's Pizza store located at 1701 S. Solano Dr. in Las Cruces, New Mexico (hereinafter "Las Cruces Store") from December 2021 to June 2022. *Id.* at 5. Plaintiff was later rehired to work as a delivery driver at the same Las Cruces Store in January 2023, and, as of the time of the filing of this Motion, continues to work at the store. *Id.* The Las Cruces Store is franchised and operated by one of the Defendants in this case, Guillermo Perales.  Defendant Perales also franchises and operates other Papa John's Pizza stores in New Mexico and Texas.

1

### A.  Plaintiff's Initial Lawsuit and Settlement Negotiations

On May 18, 2023, Plaintiff filed a Class Action Complaint in this Court.  *See Myers v. Papa Texas*, LLC et al., No 2:23-cv-00429-DLM-JHR  (hereinafter "Myers I").  In this initial Complaint, Plaintiff alleged that Defendant Papa Texas, LLC., Defendant Guillermo Perales, and several other "Doe" Defendants, failed to compensate him and similarly situated individuals with minimum wages as required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and the New Mexico Minimum Wage Act ("NMMWA"), N.M. Stat. Ann. § 50-4-21, et. seq.  Myers I, Doc. 1.

On July 20, 2023, Defendant responded to the Complaint in Myers I with a Motion to Dismiss and Compel Arbitration. Myers I, Doc. 7.  Counsel for Plaintiff and Defendant then entered discussions and Plaintiff ultimately agreed to arbitrate the matter without further briefing on Defendant's Motion to Dismiss.  Doc. 11-1.  During these initial discussions, Plaintiff also indicated he was "agreeable to exploring the possibility of a resolution in advance of incurring filing fees and other arbitration costs." *Id*.

On August 03, 2023, after having agreed to arbitration and to discussing an early resolution of the case, the parties filed a Joint Stipulation of Dismissal without prejudice.  Myers I, Doc. 10. In accordance with the stipulated dismissal, the case was closed on the same day.

Following the stipulated dismissal of the Complaint in Myers I, the parties entered settlement negotiations.  The actions taken by the parties during these negotiations are not in dispute; instead, the parties disagree about the legal effect of those actions.   The record shows that on August 22, 2023, Plaintiff sent to Defendant a settlement demand with an attached settlement agreement, "detailing the terms  [Plaintiff] will agree to." Doc. 17 at 3; Doc. 11-3.  According to

Plaintiff, after not hearing from Defendant for several weeks, Plaintiff decided to proceed with filing an arbitration demand.   In accordance with the provisions of the Arbitration Agreement at issue, Plaintiff submitted his arbitration demand to the Judicial Workplace Arbitration ("JWA") on September 11, 2023. Doc. 17-2.   Upon filing with the JWA, Plaintiff learned that the JWA would not conduct the arbitration because Plaintiff was not a Texas resident.  Doc. 17 at 4.  Because the Arbitration Agreement provided that if the JWA was not available the arbitration would be conducted by the American Arbitration Association ("AAA"), Plaintiff then filed a demand for arbitration with the AAA and paid his part of the required filing fee.  Doc. 17-3.

The parties agree that not long after Plaintiff submitted the arbitration demand to the AAA, they began to exchange both monetary and non-monetary settlement offers via phone and email. Doc. 17 at 5; Doc. 11 at 2.  On October 20, 2023, an agreement was reached over email regarding the amount of the settlement.  Plaintiff's counsel wrote,

> I'm please[d] to report that [Plaintiff] has decided to accept your client's offer.  I have attached a settlement agreement with the monetary figures added for your review, and will provide a copy signed by [Plaintiff] once he has had a chance to sign.  Once we have the agreement signed, I will notify AAA that [Plaintiff] is withdrawing his demand for arbitration.

Doc. 11-3.

On October 22, 2023, Plaintiff's counsel returned to Defendant's counsel a signed copy of the settlement agreement originally sent by Plaintiff on August 22, 2023, but supplemented it with the monetary figures agreed upon on October 20, 2023.  Doc. 17-5.  Over the next month, the parties exchanged various emails regarding the signing of the settlement agreement and the processing of settlement checks.  *See id*.  During one of the email exchanges, Defendant's counsel advised Plaintiff's counsel that she was "reviewing the release and [will] send it back to you with proposed changes.  Once the release is signed we will issue the checks.  Please feel free to call me

to discuss.  Additionally, we agreed to two checks: one to [Plaintiff] and one to your firm for fees and costs." *Id*. at 2.

Thereafter, it became clear that the parties would not be able to finalize the necessary documentation of a settlement.  The parties continued to disagree over the method of payment, timeline of payment, and the scope of the release of claims in the proposed settlement agreement. Doc. 17 at 7; Doc. 11 at 2-3.  The parties exchanged emails and revisions of the settlement agreement and release throughout November 2023, but eventually reached an impasse.

At the same time settlement discussions between the parties were occurring, the AAA was communicating with the parties and requesting that Defendant pay the administrative fee required to initiate the arbitration process.  The AAA's Employment Rules require employers to pay a $2,100 administrative filing fee.  Doc. 17-11.  Defendant received three letters informing it about the filing fee deadline but ultimately did not submit the administrative filing fee. Doc. 17-11, Doc. 17-13, Doc. 17-14. The last letter is dated November 09, 2023, and the relevant language of the communication reads as follows:

> Dear Parties:
>
> The Respondent has failed to submit the previously requested filing fee; accordingly, we have administratively closed our file in this matter. Any filing fees received from the Claimant will be refunded under separate cover.
>
> Because the employer has failed to comply with the Employment Arbitration Rules and the Employment Due Process Protocol, we may decline to administer any future employment matter involving Respondent. We ask that Respondent remove our name from its arbitration agreements so there is no confusion to the public.
>
> Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains

> indefinitely, electronic case documents will be destroyed 18 months
> after the date of this letter.

Doc. 17-14.

### B. Plaintiff's Current Lawsuit and Defendant's Motion.

On December 08, 2023, Plaintiff filed the instant lawsuit, renewing its claims against the same Defendants and again alleging that they failed to compensate Plaintiff and similarly situated individuals with minimum wages as required by the FLSA and the NMMWA.  Doc. 1.

On January 18, 2024, Defendant Papa Texas filed the current Motion, arguing that Plaintiff and Defendant entered into a binding settlement agreement and asking the Court to dismiss this case and enforce the agreement.  Doc. 11 at 3.  In the alternative, Defendant asks the Court to compel arbitration and stay all proceedings. *Id.* at 3-15. In support of its request to compel arbitration, Defendant asserts that Plaintiff executed a document titled "Mutual Agreement to Arbitrate Claims" (the "Arbitration Agreement").  *Id.* at 11. Defendant argues that through the Arbitration Agreement, Plaintiff unambiguously agreed to arbitrate any disputes related to his work for Defendant and not to participate in any class actions related to any such disputes.  *Id.* at 3-15.

Plaintiff opposes the Motion.   Doc. 17.  Plaintiff argues that the parties did not enter into a binding settlement because they did not agree to the fundamental terms of an agreement. *Id.* at 2-13.   Second, although he admits, for purposes of this Motion, that he signed the Arbitration Agreement and that the claims he has brought against Defendant would ordinarily be covered by it, Plaintiff argues that Defendant waived arbitration and therefore the motion to compel arbitration should be denied. *Id.*

In reply, Defendant disputes Plaintiff's claim that there was no enforceable agreement between the parties, asserting that the parties agreed on a monetary amount and that the minor changes made by Defendant to Plaintiff's proposed settlement does not mean that no agreement

was reached.  Doc. 22 at 5.  As to Plaintiff's assertion that Defendant waived arbitration, Defendant argues that the issue is one to be decided by the arbitrator, not this Court.  *Id*. at 9.  Even if this Court were to determine the issue, Defendant takes the position that it did not waive arbitration in this instance. *Id*.

## II.
## LEGAL STANDARDS

### A.  Formation of Settlement Agreement

Questions "involving the formation and construction of a purported settlement agreement are resolved by applying state contract law." *Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004) (quoting *United States v. McCall*, 235 F.3d 1211, 1215 (10th Cir. 2000)); *Bamerilease Capital Corp. v. Nearburg,* 958 F.2d 150, 152 (6th Cir. 1992), *cert. denied,* 506 U.S. 867, 113 S.Ct. 194, 121 L.Ed.2d 137 (1992)  ("Settlement agreements are a type of contract and are therefore governed by contract law.").  However, "[a] district court does not have the power to impose a settlement agreement when there was never a meeting of the minds." *Wang Laboratories, Inc. v. Applied Computer Sciences, Inc.,* 958 F.2d 355, 359 (Fed.Cir.1992) (*citing Ozyagcilar v. Davis,* 701 F.2d 306, 308 (4th Cir.1983)). A district court also lacks "the power to make an agreement for the parties or to decide, contrary to the facts and the law, that a draft settlement agreement was binding when the parties did not agree on it." *Id.*

### B.  General Arbitration Principles

Congress enacted the Federal Arbitration Act ("FAA") "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S. Ct. 1647, 1651, 114 L. Ed. 2d 26 (1991). The FAA has created a body of federal substantive law establishing and regulating the

duty to enforce arbitration agreements. *See, e.g.*, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625, 105 S. Ct. 3346, 3353, 87 L. Ed. 2d 444 (1985). A reviewing court must interpret arbitration clauses liberally and all doubts must be resolved in favor of arbitration. *See Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 798 (10th Cir. 1995).

"However, the right to arbitration, like any other contract right, can be waived." *Reid Burton Const., Inc. v. Carpenters Dist. Council of S. Colorado*, 614 F.2d 698, 702 (10th Cir. 1980). ""The burden of persuasion lies with the party claiming that the right to demand arbitration has been waived." *Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 775 (10th Cir. 2010). "A party asserting a waiver of arbitration has a heavy burden of proof." *Peterson v. Shearson/Am. Exp., Inc.*, 849 F.2d 464, 466 (10th Cir. 1988). "And in assessing whether that burden has been met, [courts] give substantial weight to the 'strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration.'" *Hill*, 603 F.3d at 775 (quoting *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 39 F.3d 1482, 1488 (10th Cir. 1994)).

## III.
## ANALYSIS

The parties' briefings raise four main issues. The first issue is whether there is an enforceable settlement agreement between the parties. The second is whether the initial question of waiver of arbitration is for the arbitrator to decide rather than the Court. The third issue, assuming the issue of waiver is for the Court to decide, is whether Defendant waived arbitration by virtue of its conduct after Plaintiff filed his demand for arbitration with the AAA in 2023. And the final issue is whether the agreement to arbitrate before either the JWA or the AAA was an integral part of the parties' agreement such that arbitration is limited to those two forums.

**A. The Court Finds There is No Enforceable Settlement Agreement.**

1.  The Parties' Positions

Defendant seeks to enforce what it claims is a binding settlement agreement between the parties and asks that the Court dismiss the instant federal action brought by Plaintiff. *See* Doc. 11. Defendant argues that the parties entered into a binding agreement via telephone and email during their negotiations in October and November of 2023. *Id*. at 3. Defendant agrees that Plaintiff sent a signed agreement to Defendant to execute, however, according to Defendant, that agreement "did not correctly memorialize the agreement entered into, namely that Defendant would provide payment with two checks, not three." *Id*. Therefore, the minor changes Defendant made to the agreement initially proposed by Plaintiff were consistent with the what the parties intended, and Plaintiff simply refused to honor the agreement. *Id*. Defendant concedes that the parties were unable to agree to the language of the release in the settlement agreement but contends that, under New Mexico law, this does not mean that a binding contract was not created. Doc. 22 at 4 (citing *Herbison v. Schwaner*, No. A-1-CA-34997, 2019 WL 1228072 (N.M. Ct. App. February 4, 2019)).

Plaintiff disputes that the parties entered into a binding and enforceable agreement, asserting that the parties disagreed on important and material terms of the settlement. Doc. 17 at 4-9. Plaintiff contends that, on August 22, 2023, he sent Defendant his demand as well as a proposed settlement agreement that included all the details he would agree to, including "the release of claims, the timing for payment, etc." *Id.* at 4. Plaintiff agrees that on October 20, 2023, he accepted Defendant' monetary offer, but that Defendant attempted to change the other terms of the proposed settlement agreement including the method of payment and then later the scope of the release found in the settlement agreement. *Id*. at 7-8. In Plaintiff's view, Defendant's changes and continued revisions to the settlement terms proposed by Plaintiff operated as rejections and

counteroffers.  Ultimately, Plaintiff did not accept Defendant's proposed changes and therefore, according to Plaintiff, there is no settlement agreement to enforce.  *Id.* at 13.

2.  <u>Analysis</u>

As noted above, the formation and construction of purported settlement agreements are resolved by applying state contract law.  *See Shoels*, 375 F.3d at 1060.  Under New Mexico law, "a contract must be factually supported by an offer, acceptance, consideration, and mutual assent." *Hartbarger v. Frank Paxton Co.*, 1993-NMSC-029, ¶ 7, 115 N.M. 665, 669, 857 P.2d 776, 780; UJI 13-801 NMRA (definition of contract).  "For an offer and acceptance to create a binding contract, there must be an objective manifestation of mutual assent by the parties to the material terms of the contract." *Pope v. Gap, Inc.*, 1998-NMCA-103, ¶ 11, 125 N.M. 376, 961 P.2d 1283; *see also* UJI 13-816 NMRA ("Mutual assent requires a showing of agreement by the parties to the material terms of the contract.").  Thus, for a contract to be valid under New Mexico law, there must be a "meeting of the minds" between the parties or an objective manifestation of the parties' mutual agreement.  *See Trujillo v. Glen Falls Ins. Co.*, 1975-NMSC-046, ¶ 6, 88 N.M. 279, 540 P.2d 209. "Unexpressed intentions or understandings of the parties will not be given operative effect in deciding what the parties agreed to." *Pollock as Tr. of Lewis G. & Lynn J. Pollock Revocable Tr., dated Dec. 3, 2001 v. Thompson,* 2024-NMCA-045, ¶ 23, 550 P.3d 888, 896 (citation omitted).

Based on these basic principles of New Mexico contract law, the Court finds that the parties did not enter into an enforceable and binding contract.  The Court notes first that, unlike the cases cited by Defendant, there is no dispute that the proposed settlement agreement was never signed by both parties. *See*, *e.g*. *Herbison*, 2019 WL 1228072 at *1 (noting that, "[i]mmediately following court-ordered mediation, the parties signed a hand-written settlement memorandum prepared by

9

the mediator agreeing to specific terms and conditions."); *Montano v. N.M. Real Estate Appraiser's Bd.*, 2009-NMCA-009, ¶ 12, 145 N.M. 494, 200 P.3d 544 (determining that it would enforce an executed settlement agreement despite the petitioner's claim that he did not receive notice of the administrative approval of the settlement); *Bransford v. Bransford*, No. 31,643, 2013 WL 6145906 (N.M. Ct. App. Oct. 23, 2013) (rejecting a challenge to a settlement agreement that had been fully executed for three years). Although this is not a requirement for finding the existence of a valid contract, the Court finds it noteworthy that in the cases where New Mexico courts have enforced settlement agreements, the enforceability of a fully executed agreement – where the initial intentions of the parties are explicit - is at the heart of the dispute.

Second, it is clear from the record that the parties did not enjoy a "meeting of the minds" concerning at least two issues - the method of payment and the scope of the release of claims language in the proposed settlement agreement.[1]  The question then becomes whether these issues were material terms of the contract.  *See Pope*, 1998-NMCA-103, ¶ 11.  Under New Mexico law, a "material term is any term without which [a party] would not have entered into the contract." UJI 13-816 NMRA;  *see also Jones v. United Mins. Corp.*, 1979-NMSC-103, ¶ 13, 604 P.2d 1240, 1242.  The Court finds it doubtful that whether the payment to be made by Defendant was to be accomplished in one check, two checks, or three checks, constituted an essential part of the agreement without which Plaintiff would not have agreed to resolve the litigation, and Plaintiff does not provide any sound basis to believe this would have been the case.  The scope of the release of claims, however, is somewhat different.  There is no question that the parties disagreed on this issue, as evidenced by the various emails exchanged between the parties.  Doc. 17-9.  Defendant

---

[1] It is unclear from the record whether the parties ultimately agreed or disagreed on the timing of the payment(s).

nevertheless take the position that it does not matter whether the parties agreed upon the scope of the release in the proposed settlement agreement because a binding contract was nevertheless created when Plaintiff accepted the monetary offer.[2]  Doc. 22 at 4.

The Court disagrees and finds that the language of a release bearing on the breadth and scope of the claims a party is releasing can be a material and essential term of a proposed settlement agreement between parties.  Although New Mexico courts have not directly addressed the issue, the Court finds persuasive the holdings in other jurisdictions that the terms of a release "are not a mere formality, but are instead an important reason why a party enters into a settlement agreement. If the prevention of future litigation is one of the primary goals of a settlement, the essential terms of the release needed to achieve that goal are material to the settlement agreement." *May v. Anderson*, 121 Nev. 668, 673–74, 119 P.3d 1254, 1258 (2005); *see also Nichols v. Hartford Insurance Co. of the Midwest*, 834 So.2d 217, 218–19 (Fla. Dist. Ct. App. 2002) ("Where the language of a release is disputed and the parties fail to reach an agreement as to the character, nature, or type of release to be used, an essential element of the agreement is not established."); *Bontigao v. Villanova University*, 786 F. Supp. 513 (E.D. Pa. 1992) (determining that a settlement agreement was not enforceable, even though the parties had agreed upon the settlement amount

---

[2] In support of its argument, Defendant cites only to *Herbison*, 2019 WL 1228072, a 2019 case from the New Mexico Court of Appeals.  Doc. 22 at 4.  That case, however, is not controlling or even persuasive here for several reasons.  First, it is an unpublished case from the state appellate court with no precedential value.  Second, the case is distinguishable because it involved a substantially different set of facts, most notably the enforcement of a fully executed written agreement negotiated by a mediator.  *See Herbison*, 2019 WL 1228072 at *3. And finally, and most importantly, the Court of Appeals did not determine whether the release of claims in that case was a material term of the settlement agreement; instead, the opinion focused on whether the details of a confidentiality provision were essential to the enforcement of the settlement agreement. *See id*. at *10.

and negotiated over many of its terms, because the scope of the release remained an unresolved material term).

The Court notes that it may not always be the case that a release is material to a settlement agreement; the analysis is fact specific. Here, although Plaintiff agreed to the amount necessary to accomplish a settlement, he also provided to Defendant a proposed settlement agreement which he described as "detailing the terms [he would] agree to." Doc. 17 at 3; Doc. 11-3. That proposed settlement agreement contained language concerning the scope of the release Plaintiff was amenable to in exchange for the settlement of his claims. *Id.* Plaintiff's communications, then and thereafter, demonstrated that his proposed release was a material term without which he would not settle his claims. Following that initial proposal by Plaintiff, the parties could not agree on the terms regarding the release despite numerous communications on the issue, demonstrating a lack of mutual assent. Therefore, no binding agreement to settle ever existed between the parties and the Court declines to impose one where the parties lacked a meeting of the minds. *See Wang Laboratories*, 958 F.2d at 359; *see also DeArmond v. Halliburton Energy Servs., Inc*., 2003-NMCA-148, ¶ 20, 134 N.M. 630, 637, 81 P.3d 573, 580 ("In the absence of evidence in the record of a meeting of the minds, the trial court could not find that there was mutual assent.").

### B. Whether Defendant Has Waived Arbitration is an Issue to Be Determined by the Court.

In its Motion, Defendant argues that, if the Court declines to enforce a settlement agreement between the parties, the Court should, in the alternative, compel arbitration of Plaintiff's claims because the parties entered a valid, binding arbitration agreement and his claims against Defendant fall within the scope of the agreement. Doc. 11. In response, Plaintiff does not dispute that his claims are covered by the Arbitration Agreement between the parties. *See generally,* Doc. 17. Rather, Plaintiff takes the position that arbitration is not proper because Defendant waived its right

to arbitration through its conduct before the AAA . *See id.*  In its reply, Defendant disagrees that it waived arbitration, as discussed more fully below.  Moreover, Defendant claims that, as an initial matter, the issue of waiver must be decided by the arbitrator, not the Court.  Doc. 22 at 12. Defendant claims this is so because in the Arbitration Agreement the parties delegated the issue to the arbitrator.  Doc. 22 at 12.

Again, the Court disagrees with Defendant and finds that the parties did not delegate the issue to the arbitrator.  It is true that the United States Supreme Court has held that parties may delegate to an arbitrator not only the merits of a particular dispute but also "gateway questions of arbitrability," such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. *Henry Schein, Inc. v. Archer & White Sales, Inc*., 586 U.S. 63, 67-68, 139 S. Ct. 524, 529, 202 L. Ed. 2d 480 (2019) (quoting *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010)) (internal quotations omitted). This type of agreement is known as a "delegation provision." *Rent-A-Ctr.*, 561 U.S. at 68.  However, as the Supreme Court and the Tenth Circuit have cautioned, courts should not assume that the parties agreed to arbitrate gateway questions of arbitrability unless there is "clear and unmistakable" evidence that they did so.  *AT&T Techs., Inc. v. Commc'ns Workers of Am*., 475 U.S. 643, 649, 106 S. Ct. 1415, 1418, 89 L. Ed. 2d 648 (1986); *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1281 (10th Cir. 2017) (citations, internal quotations and alterations omitted); *Clements v. Alto Tr. Co*., 685 F. Supp. 3d 1249, 1257 (D.N.M. 2023).

Here, Defendant submits that the delegation provision in the Arbitration Agreement is the language which provides that, "[t]he question of whether any particular claim is a Covered Claim under the terms of this Agreement shall be arbitrated pursuant to the procedures set forth in this agreement." Doc. 11 at 10.  But that language only deals only with what *claims* will be covered by

the Arbitration Agreement, not with whether gateway questions of arbitrability will be delegated to an arbitrator in the first instance. The Court finds that this language is far from "clear and unmistakable" evidence that the parties intended and agreed to delegate the issue of arbitrability, including waiver of arbitration, to an arbitrator. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed. 2d 985 (1995) (question of who has primary power to decide arbitrability turns on what the parties agreed about that specific matter). Because there is no delegation provision on the issue in the Arbitration Agreement, the Court, not the arbitrator, will address the issue of waiver raised by Plaintiff.

**C. Defendant Has Not Waived Arbitration.**

As noted above, a party to an otherwise valid arbitration agreement can waive its right to arbitrate. *See Hill*, 603 F.3d at 772; *see also Peterson*, 849 F.2d at 465–66. There is no definitive standard for determining what constitutes a waiver of an arbitration agreement; the determination is contingent upon the facts of each case. *See Hill*, 603 F.3d at 772. However, when making its determination, the Tenth Circuit asks district courts to consider several factors:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; [and,] (5) whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place [.]

*Peterson*, at 467–68 (quotations omitted).[3] These factors are not a balancing test, nor are they to be applied mechanically, "[r]ather, these factors reflect certain principles that should guide courts

---

[3] A sixth *Peterson* factor is "whether the delay affected, misled, or prejudiced the opposing party." *Peterson*, at 467–68 (quotations omitted). However, the United States Supreme Court has held

in determining whether it is appropriate to deem that a party has waived its right to demand arbitration." *Hill*, 603 F.3d at 773. The "overarching consideration is whether the party now seeking arbitration is improperly manipulating the judicial process." *BOSC, Inc.*, 853 F.3d 1165, 1174 (10th Cir. 2017). The "burden of persuasion lies with the party claiming that the right to demand arbitration has been waived." *Hill*, 603 F.3d at 775.

    1.  The First *Peterson* Factor

As to the first factor under *Peterson*, Plaintiff contends that Defendant acted inconsistent with its agreement to arbitrate by not paying the AAA's filing fee and otherwise failing to start the arbitration process. Doc. 17 at 17-19. Plaintiff submits that he filed an arbitration demand with the JWA on September 11, 2023, only to find out shortly thereafter that the JWA would not handle the matter because he is not a Texas resident. *Id.* at 5. On September 12, 2023, he proceeded to file a demand with the AAA. *Id.*; Doc. 17-3. He adds that it was then Defendant responsibility to pay its filing fee with the AAA. *Id.* Defendant received three letters about the filing fee deadline but still failed to submit the administrative filing fee. *Id.*; Doc. 17-11, Doc. 17-13, Doc. 17-14. Plaintiff questions Defendant's claim that it failed to pay the arbitration fee due to settlement discussions. Doc. 17 at 18. First, because Plaintiff made it clear he would not withdraw his arbitration filing until a settlement was finalized. *Id.* Second, Defendant had clear warnings that its failure to pay the filing fee would result in the AAA closing the file. *Id.*

Defendant argues in response that the parties' decision to come to an agreement on settlement does not result in a waiver of arbitration. Doc. 22 at 9. Defendant explains that it reasonably believed arbitration was not necessary because the parties had entered into a settlement

---

that, in deciding whether a party has waived its right to arbitrate, courts should focus on that party's conduct, and not on how its conduct affected the opposing party. *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 417-419, 42 S.Ct. 1708, 212 L.Ed.2d 753 (2022).

agreement. *Id.* Additionally, Defendant argues that its failure to pay the filing fee does not prejudice Plaintiff because Plaintiff would benefit more from class action arbitration than litigation. *Id.* at 10.

The Court finds that the first *Peterson* factor weighs in favor of finding no waiver.  This is not a case where a party proceeds with litigation and fails to mention the presence of an arbitration agreement until a later time.  Although the Tenth Circuit has held that a party's complete failure to promptly mention the presence of an arbitration contract to a district court is clearly inconsistent with an intent to arbitrate, *see In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust Litig.*, 790 F.3d 1112, 1117 (10th Cir. 2015), here Defendant timely notified the Court of the presence of an Arbitration Agreement, filing its Motion only seven (7) weeks after the Plaintiff filed his Complaint.  Doc. 1, Doc. 11.  As to its failure to pay the filing fee necessary to initiate arbitration before the AAA, the Court finds credible Defendant's assertion that it did not believe it was necessary to begin arbitration because the parties were involved in settlement negotiations, even if Plaintiff had stated he would not withdraw his filing and despite the warning by the AAA that it would close the case.  In fact, these facts tend to show Defendant truly believed, even if it was mistaken, that the parties had a binding agreement and that a final settlement was imminent.

### 2.   The Second *Peterson* Factor

Regarding the second *Peterson* factor, Plaintiff argues that Defendant waived its right to arbitrate by engaging in the machinery of litigation. Doc. 17 at 19. Specifically, Plaintiff alleges Defendant engaged in the machinery of litigation by asking the Court to enforce a settlement agreement and dismiss the case, only asking for arbitration if the Court were not to agree to its request. *Id.*  Plaintiff also argues that Defendant waived its right to arbitrate by bringing the issue of a purported settlement in this Court as opposed to bringing it in the first instance before an

arbitrator. Doc. 17 at 19-20. In response, Defendant submits that it has not engaged in the machinery of litigation. Doc. 22 at 10. Aside from filing the instant Motion, Defendant has not sought relief from this Court, and its actions consistently indicate an intent to arbitrate. *Id.*

The Court finds that the second *Peterson* factor also weighs in favor of finding no waiver. The Court notes that, although Defendant did ask this Court to enforce the settlement agreement rather than raise the issue with an arbitrator, it did nothing else that could be considered invoking the machinery of litigation, much less substantially doing so.  *See Peterson*, 849 F.2d at 467-68 (describing the second *Peterson* factor as whether the litigation machinery has been *substantially* invoked). It was Plaintiff who initiated this second lawsuit by filing the action in this Court and Defendant's decision to ask this Court to enforce what it believed to be an enforceable agreement does not indicate that it intended to abandon its right to arbitration. The fact that in the same Motion Defendant moved to compel arbitration, even if it was requested as an alternative form of relief, demonstrates that Defendant maintained its interest in pursuing its rights in that forum.  In addition, unlike the situation in *In re Cox*, where the Tenth Circuit agreed that a party had waived arbitration, this litigation has not proceeded to pretrial discovery, there has not been a substantial exchange of documents, no experts have been retained, and no witnesses have been deposed such that it could be said that the litigation was in full swing before Defendant sought arbitration.  *See In re Cox*, 790 F.3d at 1115. Again, other than filing this Motion with the Court, Defendant has taken no action outside of arbitration that could be interpreted as indicating its intention to litigate outside arbitration.

Neither party addresses factors three, four, and five of *Peterson*, but a cursory analysis of those factors similarly weigh against finding waiver.  Regarding the third factor, Defendant did not request arbitration enforcement close to the trial date or delay for a long period before requesting

a stay. As discussed above, Defendant filed this Motion only weeks after Plaintiff filed his

Complaint and well before the Court could issue a Scheduling Order and set a trial date.  As to the

fourth and fifth factors, Defendant did not file a counterclaim nor were there any intervening events

that had taken place demonstrating, for example, that Defendant intended to take advantage of

judicial discovery procedures not available in arbitration. *See Peterson*, 849 F.2d at 468.

For these reasons, the Court determines that Defendant did not waive its right to request

arbitration.

**D. The Arbitral Forum Was Integral to the Arbitration Agreement and the Parties' Agreed Only to Arbitration Before the JWA or the AAA.**

1.  The Parties' Positions

Plaintiff contends that even if Defendant has not waived arbitration, his claims cannot be

compelled to arbitration because neither of the agreed-upon providers are available. Doc. 17 at 20-

23.  Plaintiff submits that the parties agreed that all arbitrations must be administered by either

JWA or, if unavailable, then the AAA. Doc. 17 at 19. Plaintiff relies on the provision in the

Arbitration Agreement which provides in relevant part:

6. Procedure

a.  **Who Shall Arbitrate?**

All arbitrations under this Agreement shall be administered by Judicial Workplace Arbitration, Inc. under its rules for the resolution of disputes, and if not available, then the American Arbitration Association ("AAA") and its rules. . .

Doc. 17-1 at 5.  He claims that the JWA is not available to him because he is not a Texas resident,

and that the AAA is not available due to Defendant's failure to comply with its rules. The last letter

from the AAA reads that "[b]ecause [Defendant] has failed to comply with the Employment

Arbitration Rules and the Employment Due Process Protocol, we may decline to administer any

future employment matter involving [Defendant]." *Id*.  Because the parties only agreed to arbitrate before these two specific entities, states Plaintiff, then arbitration cannot be compelled in this case.

In reply, Defendant argues that, if the JWA and the AAA are not available, the Court may appoint an arbitrator pursuant to § 5 of the FAA.  That section provides, in pertinent part, that,

> [i]f in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators....

9 U.S.C. § 5.

Defendant also asserts that arbitration before the AAA is not "integral to the parties [Arbitration Agreement]" because Plaintiff attempted to initiate arbitration with the JWA.  Doc. 22 at 10-11. Even if it is integral, Defendant submits the AAA has not rejected arbitrating this matter. *Id*.  Instead, the AAA stated that it "may" decide not to arbitrate this matter in the future.  *Id*. at 11. According to Defendant, "Plaintiff's claims that AAA will steadfastly reject any arbitration is overstated and misleading." *Id*.

2. <u>Analysis</u>

The Tenth Circuit Court of Appeals has not addressed whether § 5 of the FAA applies in cases where the designated arbitrators are no longer available or decline to proceed over an arbitration.  However, outside the circuit, federal courts have taken two approaches.  One approach, taken by the Second Circuit Court of Appeals, is to hold that, in situations where the  parties to an arbitration agreement contractually agree to a specific arbitrator who is then not available, district courts cannot "use § 5 [of the FAA] to circumvent the parties' designation of an exclusive arbitral

forum" because such unavailability does not constitute a "lapse in the naming of an arbitrator" within the meaning of § 5.  *In re Salomon Inc. Shareholders Derivative Litig. 91 Civ. 5500 (RRP)*, 68 F.3d 554, 560-61 (2nd Cir. 1995);  *Moss v. First Premier Bank*, 835 F.3d 260, 265 (2d Cir. 2016). According to this approach, the "lapse referred to in § 5 means a lapse in time in the naming of the arbitrator or in the filling of a vacancy on a panel of arbitrators or some other mechanical breakdown in the arbitrator selections process." *Id*. at 560 (internal quotation marks and citation omitted). Thus, § 5 does not apply when a designated arbitrator is not available or declines to preside over a matter. *See id.*  This is so because "[o]nce the designated arbitrator refuses to accept arbitration, there is no further promise to arbitrate in another forum." *Moss*, 835 F.3d at 265 (internal quotations and citation omitted).

The second approach, followed by the Eleventh, Ninth, Fifth, and Third Circuit, as well as a number of other jurisdictions, including the New Mexico Supreme Court, is less rigid and focuses its analysis on the intent of the transacting parties as evidenced by the plain language of the contract.  More specifically, the focus is on whether the forum selection in an arbitration agreement is "integral" to the contract or merely an "ancillary logistical concern." *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000); *see also*, *e.g.*, *Reddam v. KPMG LLP*, 457 F.3d 1054, 1061 (9th Cir. 2006), overruled on other grounds in *Atl. Nat'l Trust LLC v. Mt. Hawley Ins. Co*., 621 F.3d 931, 940 (9th Cir. 2010); *Ranzy v. Tijerina*, 393 Fed. Appx. 174, 175-76 (5th Cir. 2010); *Khan v. Dell Inc*., 669 F.3d 350, 354 (3rd Cir. 2012); *Rivera v. Am. Gen. Fin. Corp*, 2011-NMSC-033, 150 N.M. 398, 259 P.3d 803 (2011).

In this case, under either of the approaches discussed above, the Court determines that it cannot appoint an arbitrator pursuant to § 5 of the AAA.  Under the first approach, there is no question that the parties agreed to two specific arbitration forums – the JWA or the AAA, and so

20

the judicial appointment of an arbitrator in the event that these two forums are unavailable would circumvent the parties' intended designations, run afoul of the contractual agreement between them, and have no support in §5 of the FAA. As to the second approach, the Court finds the New Mexico Supreme Court's decision in *Rivera* to be instructive. *See Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997) ("A court may not ... construe [an arbitration] agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law.") (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n.9, 107 S. Ct. 2520, 2527, 96 L. Ed. 2d 426 (1987)).

In *Rivera*, the New Mexico Supreme Court held that the arbitration provisions in a title loan contract could not be enforced because the agreement relied on the now-unavailable National Arbitration Forum (NAF) to arbitrate disputes. *See id.* at ¶¶ 28-30. The Court reasoned the arbitral forum was an integral requirement of the parties' agreement, relying in large part on the intent of the transacting parties as evidenced by the plain language of the contract. *Id.* ¶ 24. More specifically, the arbitration provision stated that arbitration "will be conducted pursuant to the Rules of the NAF." *Id.* at ¶ 32. Although the state supreme court recognized that some courts had concluded that the identity of the arbitration provider was an ancillary logistical concern in contracts where the arbitration provisions did not specifically designate a provider, it held that an arbitration agreement's express designation of a particular arbitration provider weighed in favor of a finding that the designated provider was integral to the agreement to arbitrate. *See id.* at ¶¶ 28-29 (comparing *Jackson v. Payday Loan Store of Ill.*, No. 09 C 4189, 2010 WL 1031590, at *1 (N.D. Ill. Mar. 17, 2010) (concluding that where "the arbitration agreement offers a choice of arbitrators, the selection of a single particular arbitrator cannot logically be so central to the agreement as to merit voiding it") and *Premier Real Estate Holdings, LLC v. Butch*, 24 So.3d 708,

709–10 (Fla. Dist. Ct. App. 2009) (concluding that the choice of arbitrator was not integral because the contract had an unfilled blank space for designating an arbitrator) with *QuickClick Loans, LLC v. Russell*, 407 Ill. App. 3d 46, 347 Ill. Dec. 876, 943 N.E.2d 166, 174 (2011) (holding unenforceable an arbitration agreement that specified arbitration before one of two arbitration providers, both of which were unavailable)).  The *Rivera* court also found compelling the fact that the parties' agreement used mandatory language when discussing the designation of the arbitral forum.  As explained by the court, "[m]andatory, as opposed to permissive, contractual language further demonstrates that a specifically named arbitration provider is integral to the agreement to arbitrate."  *Id*. at ¶ 31.  The *Rivera* court noted the use of mandatory language throughout the agreement at issue, including statements that "arbitration *will* be conducted under the rules and procedures [of the NAF]," and "the NAF *will* provide" a list of potential arbitrators, and the "NAF rules *shall* determine what portion of the costs" the parties will pay.  *Id*. at ¶ 34 (emphasis in original).  In short, the specific designation of an arbitral forum and the use of mandatory language regarding the appointment of the specific forum confirmed that arbitration by the NAF was integral to the arbitration agreement between the parties.  *See id*.

In this case, under the second and most commonly followed approach on this issue, the provisions of the arbitration agreement between the parties demonstrate that the designation of the JWA and the AAA was integral to the agreement to arbitrate.  The Arbitration Agreement's unambiguous language indicates that the parties intended for, and expressly designated, either the JWA or, alternatively, the AAA, to be the exclusive arbitral forums in this litigation as evidenced by the mandatory language used by the parties.  The agreement reads, "All arbitrations under this Agreement *shall* be administered by Judicial Workplace Arbitration, Inc. under its rules for the resolution of disputes, and if not available, then the American Arbitration Association ("AAA")

and its rules." Doc. 17-1 at 5 (emphasis added).  No other options are provided.  Under either approach taken by courts regarding the applicability of §5 of the FAA, the Court determines that it cannot appoint an arbitrator that the parties did not agree to in the Arbitration Agreement.

The Court does agree, however, that it is unclear whether the AAA will decline to accept the arbitration in this case, given its previous communications with the parties.  The Court will therefore order that the parties submit this matter to the AAA to determine whether the agreed-upon arbitral forum will accept the arbitration.

## IV.
## CONCLUSION

For the reasons stated more fully above, the Courts finds there is no enforceable settlement agreement between the parties.  The Court also determines that, because the parties did not delegate the issue to the arbitrator, the issue of waiver is for the Court to decide, and the Court finds that there was no waiver of arbitration by Defendant.  Finally, the Court concludes that the express designation of the JWA or the AAA to be the arbitral forums in this case was an integral part of the parties' agreement such that arbitration is limited to those two forums.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss and Enforce Settlement Agreement (Doc. 11) is hereby **DENIED IN PART** and **GRANTED IN PART** for the reasons described in this Memorandum Opinion and Order.

**IT IS FURTHER ORDERED**  that the parties will submit this matter to arbitration pursuant to the Arbitration Agreement between the parties.  This  matter will be STAYED without prejudice until the parties determine whether arbitration will be accepted by the AAA.  In the event the AAA declines to arbitrate this matter, or is otherwise unavailable, the Arbitration Agreement will be unenforceable, and the parties will proceed before this Court.

The parties shall submit a joint status report to the Court within 60 days, advising the Court of the status of this matter.

_____
UNITED STATES DISTRICT JUDGE